With that, we'll begin with case number 16-60246, Delautter v. Woodall. As well, rebuttal is for rebuttal only, so don't try to raise something new on rebuttal. Mr. York. May it please the Court, my name is Benton York, and I represent the appellant Thad Delautter, who is the plaintiff at the District Court. I've reserved five minutes for rebuttal time. Mr. Delautter was diagnosed with rheumatoid arthritis at the age of two. I've met Mr. Delautter. He's a 43-year-old man, and as the record shows, he's about five feet tall, weighs about 100 pounds. He has this rheumatoid arthritis is a permanent congenital condition that he will live with his entire life. And in 2011, it was known by the defendants that he needed a hip replacement. Do I understand there's a motion to supplement the record that's still pending with the Court? Yes, sir. What's your position on that motion? I believe that the position was taken that it was not opposed at the time. That record is, I think, not relevant to the extent that in 2011 we already know that surgery was not going forward because. But just to be clear, it may or may not be relevant, but do I understand correctly, then, that as of January 17th, patient, quote, understood and agreed with the treatment plan going forward? I think that there is some dispute about what occurred at that time, but as far as supplementing the record, that would be something we would not oppose at this time. There have been additional events that have taken place since then that may also be relevant. Does he still need the surgery? He still needs the surgery. Okay. Has he gotten it?  And when is he supposed to be released? He is going to be released in 2031. He has no possibility of parole. And so if he had all the money in the world, could he arrange for the surgery himself without the Bureau of Prisons or the Texas Department? I think so. Sorry, the Mississippi Department. Because in 2011, Dr. Knipper was ready, willing, and able to do the surgery, and he did not do it because he was told that it would not be paid for. So it's a money thing? I mean, it's because Mississippi has to pay for it? That's what this record reflects. Okay. Well, the reason I ask about the motion to supplement is what it appears to reflect is your client's own medical records. April 16th, it appears that the State was about to perform the surgery. Obviously correct me if I'm wrong, but it appears that the State was willing to do the surgery, but he opiately admitted to being using marijuana and therefore was not able to do the surgery at that moment. And then in January of 17, the doctor talked to him again about the surgery and encouraged a different kind of protocol to which your client agreed. So that's what I'm trying to figure out. Is there even a dispute that your client has with the State at this point, given the State of this record? Yes, Your Honor. Certainly Mr. DeLauro would dispute that medical record specifically is somewhat confusing because it says, oh, because he's going to be out in five years, then he's just going to wait, and that is certainly not the case. He's not going to be out until 2031. What I see in the January 17 record is he is in jail but expects to be released in the next five years if all goes as planned. Would it be fair to say that he apparently told the doctor that he was going to be leaving in five years? It is very difficult to imagine that being the case. That medical record is very confusing. I guess we would also say that there is a pattern of surgery being scheduled and then being canceled at the last minute as reflected in this record, including as recently as yesterday. After the appellant brief was filed for this case, the State said, hey, we're going to schedule it for October 1st, the day before oral argument. Less than a week ago, again, the surgery was canceled without any specific explanation. And he still wants and needs the surgery? Yes. And he still can't get it without Mississippi paying for it? That's correct. So if he were released tomorrow, he wouldn't be able to get it? From a financial standpoint, I'm not entirely sure what his specific financial standpoint would be. He's certainly in form of papyrus. He has permanent disability. There may be Medicaid or some other payment, but that is the issue here. That's been the issue as reflected in the record since the fall of 2011. But I guess I'm wondering, so you have the money issue, but you also have, I mean, you can't just walk out of prison and head over to the hospital and get the treatment you want. The prison has to accommodate that. I mean, you're not a free person to go get the medical care you want. Is that an issue here, the sort of cooperation aspect of it? In other words, if I said, look, I've got the money, I want my surgery, but you've got to let me out to go get it, is that piece? There is certainly an issue with, for example, you'll see that the record shows that there was, of course, surgery scheduled in October of 2011, and then nothing happens for all of 2012. No one has pointed to anything that happens in 2012. Until January of 2013, there is a complaint that Mr. DeLauder filed, a medical complaint saying, hey, I still need this surgery. So I think that that record certainly suggests that he is at the mercy of the administrators to be able to get out and get the medical care that he needs. He certainly cannot. Two aspects to this. Okay. So we also have an issue of qualified immunity dealing with the past. So we've got the future piece, which is the injunctive relief, and then we've got the past and the qualified immunity question. And we asked you to take a look at the question of how an unpublished opinion factors into this whole issue of putting the administrators and doctors on notice of what they're supposed to do to comply or not violate the Constitution. Yes, Your Honor. Can you speak to that? So the Cooper case that the Court cited specifically talks about, the quote that it has is that we must be able to point to controlling authority or a robust consensus of persuasive authority that defines the contours of the right in question with a high degree of particularity, and that this does not mean that a case directly on point is required. And in Cooper, this Court discussed the All-Kid case, which was from the United States Supreme Court, which really was more about one extreme, where the Ninth Circuit had been overly general in defining the right that was violated there. It was essentially you violated the Fourth Amendment. And it sort of goes into a broad historical assertion of what the Fourth Amendment meant. And so that opinion was one extreme. On the other end, the Hope v. Pelzer case, I would cite to the Court as another case from the United States Supreme Court that is still good law. It came before All-Kid, and All-Kid did not call this into question, but where they made it clear that officials can still be on notice that their conduct violates established law, even in novel fact circumstances, and that really the touchstone of the analysis for whether a right is clearly established is fair warning to the official, whether the State at the time gave fair warning. Mr. York, I hate to interrupt you, but Judge Haynes' point was we said, as I understand it, correct me if I'm wrong, in a footnote, that unpublished opinions cannot constitute clearly established law for purposes of qualified immunity. Is that the law of this circuit, or is there some nuance that you want to tell us about? Because it seems to me, again, correct me if I'm wrong, that you're pointing to unpublished case law that would serve to put at least one of the defendants on notice, Mr. Hatton, Dr. Hatton. Sorry if I got the name wrong. What about the unpublished case law point? And then I'll follow up. So I think to the unpublished case law point, I have not found cases that say that that is a bright-line rule, that unpublished case law as a matter of law is never sufficient. I think that in the context of what Cooper says, that a robust consensus of persuasive authority, that unpublished case law falls under that umbrella. I mean, look, frankly, to help you out a little bit, it's so I can imagine a bunch of unpublished cases that just point to a robust consensus of established case law that would be sufficient to put a defendant on notice. And they're just unpublished because it's already so established. I can imagine that. But so help me. I'm thinking specifically about Dr. Hatton. Do I have the name right? Mr. Hatton. Mr. Hatton. Sorry.  He's an administrator. Dr. Woodall is the So what cases are you relying on in particular? I understand you don't need a case directly on point, but what cases are you relying on that if Mr. Hatton had been informed of them, he would have said, yeah, gosh, what I'm doing here is violating the Constitution. What are your best cases for that? So obviously the most factually similar cases are the unpublished cases that we cited in our brief. I do believe, however, that there are even published cases that do point to the fact that delay in medical care establishes a violation of the Constitution. Well, so would you agree with me that simply the statement that delay in medical care that's deliberately indifferent violates the Eighth Amendment, that's not specific enough to put someone on notice? Or would you disagree with that? I would disagree with that. I think that it's certainly it's Well, how is that different from the Ninth Circuit saying the Fourth Amendment prohibits some reasonable searches and seizures? It's just a general statement of law. The reason I would push back on that, Your Honor, is that this Court has cited that as being sufficient in the past. Easter v. Powell, 467F3459 is the cite for that one. What are the facts of that case? So it's specifically the prisoner had complained about chest pains, and he was not provided with care for his heart condition. And in that situation, this Court said, The law was clearly established that a prison inmate could demonstrate an Eighth Amendment violation by showing that a prison official refused to treat him, ignored his complaints, intentionally treated him incorrectly. And caused pain in the process as well. That's correct. Pain is a real aspect of all of this. That when you know that someone is in pain, and we've said that repeatedly. I also wonder, in Cooper v. Brown, what they actually did was affirm the denial of qualified immunity. And the footnote in question actually says, Because it is unpublished, it does not constitute clearly established law. But it aptly illustrates the established right. And then goes on to describe it as supportive of the notion of denying qualified immunity. So I think what this is perhaps saying is, It can't establish the constitutional right in question. But as you say, that's already been established. You have a right to medical care. You can't have deliberate indifference to that. All of that. Here, the details, the specifics can be fleshed out by the unpublished case law. Is that what's occurred here? Your Honor, I would agree with that. I think that that is, there are numerous cases that are published that do discuss this deliberate indifference standard in the context of the delay or denial of medical care. And that these published cases are, they do show how this Court can, and I think should, interpret the record here. What's your best articulation? So, again, focusing on Mr. Hatton. What's your best articulation of the allegations in this case against him for an Eighth Amendment violation? Because what I imagine the analysis has to be is I have to understand your allegations, I have to take them as true, and then I have to look at the case law and see, well, was there clearly established law that would have put him on notice that doing these things, if he did them, constitute an Eighth Amendment violation? So just help me. What's your best articulation for what Mr. Hatton is supposed to have done? Mr. Hatton, the record reflects, had the ability to approve and direct Mr. DeLauter's medical care to see specialists and to provide, to make sure that the specialized care he needed was carried forward. This record, going back to... As I showed deliberate indifference. I understand your allegations are deliberate indifference, but give me the allegations that amount to deliberate indifference on Mr. Hatton's part. That they knew in 2011 that he had a failed hip arthroplasty. That because of that, specifically the medical judgment here, and this goes to that they did not follow the medical judgment in this case. The medical judgment in 2011 was this man needs hip replacement, and in fact, he needs reconstructive surgery because the failure of his hip replacement has already there has been no surgery provided for. And there have been years... And does it cause continuing pain? Yes. As well. That is correct. It continues to deteriorate because the surgery has not taken place, and they have not... I didn't think pain was at issue. What I thought was at issue was Mr. Hatton not, you know, doing something in the face of facts or in the face of somebody else's opinion that was so bad that it constitutes deliberate indifference, and not merely a disagreement about medical treatment. What is Mr. Hatton supposed to have done that is so bad that it goes beyond a disagreement about treatment and is just deliberate indifference? So, specifically, Easter v. Powell also says that the failure to follow a prescribed course of treatment... I'm talking about Mr. Hatton. I understand what Easter says. Mr. Hatton had knowledge that there was a very serious medical condition, which is a finding of the district court that has gone uncontested, that this condition was deteriorating, had already deteriorated, and is continuing to cause pain to Mr. Hatton that could ultimately lead to his being paralyzed. And is Hatton the guy that could authorize or not authorize the surgery? I think that's the point we're trying to get to here. He's aware of all this stuff, but what is Hatton's role in depriving Mr. DeLauder of what he needed? So, what we have on this record is that, and I see that my time is up. I said I can keep you here, and I'm doing that. So, please, answer the question. Mr. Hatton, on this record, it shows that he was the medical administrator for the district court and that he approved the transportation of and the medical treatment of. So, is he the guy with the power to make it, like, today, if he's still in that role, is he the guy that can make it happen tomorrow or thereabout? Based on this record, I think that the court could certainly find that. Okay. All right. Thank you, Mr. York. Appreciate it. Thank you, Your Honor. And you've saved time for rebuttal. May it please the Court, my name is Chad Williams with the Mississippi Attorney General's Office, and I represent Michael Hatton in the state of Mississippi. I would like to address . . . Okay, Mr. Williams.  This guy needs surgery. I agree, Your Honor. Are you going to get it? It's been seven years. I mean, never mind all of the deep and important law, I mean, the state of Mississippi has its own laws. What about that? Why is this guy not getting the surgery he needs? Because surgeons have declined to do the surgery. The state of Mississippi is not the surgeon. The state of Mississippi is not . . . Have you agreed to pay their fee? That is not an issue, Your Honor. If you look at Gloria Perry's affidavit that was submitted in support of the motion for summary judgment, she says that money is not at issue in this case. Okay, but Mr. DeLauder said that he was told by the doctor that they wouldn't pay. That's the sworn testimony, firsthand knowledge, is from Dr. Perry that says that money is not at issue. Okay, but . . . Dr. Knipper, we do not know why Dr. Knipper wouldn't do it. Well, he told DeLauder it was because he wasn't getting paid. So, I mean, that to me is . . . He has since been to the University of Mississippi Medical Center. They refused to do the surgery, as mentioned by Appellant's counsel. He has since been . . . Mississippi Department of Corrections is outside the record, but for your information, they tried to get Campbell Clinic in Memphis to do it. They would not take him. Tulane Medical Center would not take Mr. DeLauder. Oshners, who I believe originally did the surgery in 1992, would not take Mr. DeLauder. Finally, he went to the University of Alabama at Birmingham, had surgery scheduled yesterday, and the surgeon went before the panel. It was something this complex. He goes before a panel of his peers and says, Hey, I'm getting ready to do this. What do you all think? How should I proceed? They said, You need to see . . . Again, this is outside the record. You need to see the original medical records on what was done in 1992. They canceled the surgery. He's been to three different places to do the surgery. He needs to see the records, and he saw them and canceled it, or he just didn't get them? He's waiting to get them, Your Honor. Is he going to be able to then do it? I can't answer that question. I don't know what the doctor is going to be able to do once he reviews them, if he can get them. Are they just refusing to do it because he's in custody? Complex, Your Honor. Because it's a complex surgery? Very complex. Is that caused by the seven-year delay? No. It's caused by the fact that this gentleman has rheumatoid arthritis since he was an infant, and he had his hips replaced 25 years ago. So if the owner of Amazon showed up and said, I've got all the money in the world, I want this surgery, they would say, Oh, it's too complex? All the money in the world, somebody may do it and do it wrong and poorly just to get the money, but I believe a respectable surgeon would do what every surgeon in this case has done and say, I'm reluctant to go there. I'm not saying the surgeon at University of Alabama won't do it. I don't know what he's going to do. But, you know, it's not an initial surgery. It is a reconstruction. So the way I think about it is renovating a house, you know. You're not going in, you're not building it from scratch, you're not putting together studs. You're going into what somebody else has already done. If the house is going to collapse on someone's head, then you've got to do something, and this notion that, well, it's hard and it's whatever, I mean. And that's medical judgment. Clearly these surgeons don't believe the house is ready to collapse or they would have, you know, taken a measure to stop that from happening. They believe he must be stable enough to not perform the surgery. Mr. Williams, who do you represent in this case? State of Mississippi, Michael Hatton. Okay. So what is, so on the qualified immunity, your client, is it Mr. Hatton or Dr. Hatton? Mr. Hatton. I'm getting this wrong. Mr. Hatton. Mr. Hatton is being sued and his qualified immunity is an issue in this case. I asked your friend on the other side, what's the best allegations against Mr. Hatton that show deliberate indifference? What's the story that shows he was deliberately indifferent? So what's, could you answer that for me? I know it's your client, but, you know, what is he supposed to have done that amounted to deliberate indifference to this person's medical needs? I do not know because when Thad DeLauder went to Michael Hatton, Michael Hatton's the one that got him referred to the surgeons. He helped Thad. You're talking about Nipper. Dr. Nipper, correct. Okay. Is it alleged that Mr. Hatton told Mr. DeLauder, we're not going to do your surgery because it's too expensive? I don't believe so, Your Honor. That's not in the record. So what is your client alleged to have done? Evidently he refused, is it alleged that he refused to order the surgery? Because he has the authority to do that? He referred him to the surgeon who used his medical judgment and decided not to do it. The allegation, I believe Mr. DeLauder's allegation is they wouldn't pay for it. But that's been rebutted by Dr. Perry's affidavit. Well, that's a fact question. I mean, the fact that one person says something and another person says something else is not a basis for a matter of law. That's a fact question. But it doesn't have to be tried, Your Honor, because it is apparent from the record that Mr. DeLauder has received treatment continuously. This is not a case where he's saying I need something, I have not been provided anything. Mr. DeLauder's receiving treatment. Okay. But it's down to this issue of the surgery. And so it may be that if we send it back, the record you're speaking of that you very, you know, accurately told us is not in the record, might support that you all have tried and just not been able to. And that's a different question. But the case we're dealing with, we're back in time, is an alleged refusal based upon a decision not to pay for it. And I will say, I'm not saying that happened here, it wouldn't be the first time I've heard that, that they don't want to pay for something. I mean, we get prisoner cases a lot where somebody needs medical treatment and the prison doesn't want to pay for it. So that is not a shocking thought that that could happen. So how do we deal with that piece of this case? I mean, maybe the future, you all are doing everything you can, and that's what the record would show if we sent back, for example, the injunction or something like that. But on the qualified immunity, the point in time we're looking at is 2011. Never says they won't pay me. Perry says we will or that's not an issue or whatever that means. What do we do with that? The point of qualified immunity is to avoid those kind of expenses that would go into sorting all of that out. And the plaintiff is not alleged violation of clearly established law here. Okay, it's clearly established that you have to give necessary medical care for serious medical conditions. You can't just leave somebody in pain, you know, this 5-foot, 100-pound guy just lying there in agony. And so that is clear to the extent we need some filling out of the established right, as Cooper suggests. We have all of this unpublished case law that seems very, very close to the matter at hand. Again, assuming that Hatton wouldn't pay for the surgery. If he would pay for it, well, fine. That's a different story. But that's what we have the fact issue on right now. And fact issues can, in fact, prevent qualified immunity from going forward. That's a very critical point. So we don't just believe the State on everything. Okay? So explain. I still haven't heard what the allegation is with respect to Mr. Hatton. Isn't that? There may be a fact issue with respect to a bunch of other people, but where's the fact issue with respect to Mr. Hatton? I still don't understand. All I've heard is that he refused to or allegedly refused to order medical treatment. That can't possibly be enough to show a deliberate indifference claim. Correct, Your Honor. And the record reflects, through Mr. DeLauder's own testimony, that Eric — I'm sorry, Michael Hatton is the one that provided, got him to the outside providers. And where would I find that in the record? That is at 749 and 763, 63 through 764, which is Mr. DeLauder's testimony at the omnibus hearing in this matter. Is cost relevant to the Eighth Amendment? In other words, does the Eighth Amendment require the state to provide the gold-plated services that the richest person could afford, or is it some sort of middle standard? What's clearly established in this regard? I would say reasonable medical care. Is that the dispute, that the state was willing to pay X, they just weren't willing to pay Y? I don't believe that is. In other words, there's clearly a fact dispute. That's what I think Judge Haynes is getting to. What I'm asking is, is it a fact dispute that actually implicates clearly established law? No. And is that because of the cost issue, that he's asking for gold-plated care, whereas you're only required to provide something short of gold-plated? I'm just trying to understand what your case is. Again, and I go back to this, I think it's the complexity. I don't think there's an amount of money that's going to sway a surgeon one way or another. They're having to open this man up and fix something that was done 25 years ago, and that's very difficult and there are a lot of risks. And I don't know that money can fix it. I don't believe that can fix that here. On Mr. Hatton, because of your exchange with Judge Duncan, is Hatton the guy that can sign off or agree to or refuse? Let's say, forget the issue of this is complicated. Let's say he needed surgery that's very standard but that's very much needed. And Hatton, and somebody at the prison has to authorize that. Is that Hatton or not? Not anymore, Your Honor. Okay, but at the time? So that's the decision. It's not just, so if the decision would be, putting aside whether the surgeon would do it, let's say the surgeon's ready, willing, and able, and the person with the decision maker says, no, I'm just not going to let him do it. That could be an Eighth Amendment violation. That could be. And Hatton's the guy, right? That's correct. So this all matters, this issue of was it cost, was it this, was it that, whatever, because Hatton is the decision maker. He's not the top decision maker. He was the decision maker for that prison. He's the guy that would sign off on the form necessary for them to transport him and blah, blah, blah, and all that. Okay. All right. Is there information in the record from which we can determine what the decision was before Mr. Hatton? Let's say we accept the allegation that he did not order a particular surgery. Where's the information in the record where we can use to evaluate his judgment? There is none, Your Honor, that I'm aware of. Okay. I'll ask the other side of that in rebuttal. Let me just ask you this as a follow-up. It's kind of a broader legal question. Whose burden is it to show qualified immunity, the existence or the nonexistence of qualified immunity? It's my burden to bring it, and it's plaintiff's burden to defeat it, Your Honor. And if you want me to talk about the published versus unpublished issue, I believe that the answer on that is no. It's not clearly established law. Westby, the Supreme Court in Westby, said the only person that can establish clearly established law is U.S. Supreme Court, and they were silent about what the circuits could do. Well, what if there's just a robust consensus of opinion on the circuits with respect to a particular issue that's specific enough to put someone on notice? Couldn't that establish clearly established law? And I believe that's where this Court's own rules dictate if it's that important it should be published. Rule 47.5. Why doesn't that cut against you? I mean, the fact that something is so established that it's unpublished, let's just stipulate that the Court's decision not to publish was a correct one. To my mind, that cuts against you because the law is so well established that we don't need to publish. Well, if it's going to — if you're setting boundaries for qualified immunity beyond what the Supreme Court has said and you've said in your published opinions, if you're going to move those boundaries, you have to let the law enforcement officer know because that law enforcement officer is entitled to know these are the boundaries within which I can work. If I go beyond that, I'm going to have personal liability. So if it's important enough that they need to — if it's a shift in the boundaries, they need to know that. I don't think anybody disagrees with that. The question is are we somehow forbidden from looking at unpublished opinions? I think an unpublished opinion can reflect clearly established law, but I don't think it can be used to say that the factual scenario in an unpublished opinion, you can make a determination from that. And I would like to address the unpublished opinions that were cited by an appellant if I can, because those — I actually want to ask you something because you're running out of time that we haven't talked about, which is the injunctive relief. You would agree that the immunity doesn't exist on the injunctive relief. Correct. Okay. So we still have to deal with the fact that the Court just sort of granted that immunity to the injunctive relief when we still have a guy who doesn't have the surgery for whatever reason, and maybe we need more factual development of that, and maybe he'll yet get it from Alabama once they review his medical records or whatever happens, but we still have this guy who needs surgery that he hasn't gotten. So the injunctive relief still matters. Would you agree that we at least need to remand on that? No. Why? The ex parte young issue I think is relevant whenever you're dealing with pleadings or when you're screening cases to determine if injunctive relief is available. You don't look at the merits. You look and see if it's available. Here, the district judge or the magistrate determined there was no constitutional violation. Well, if there's no constitutional violation, you can't have injunctive relief because it has to be for an ongoing violation of federal law for ex parte young to kick in. So at the pleading stage, if we had filed a Rule 12 motion to dismiss, the judge should have said, nope, injunctive relief couldn't be available here. This needs to go forward. At the summary judgment stage, he determined that there was no constitutional violation, so there's no ongoing constitutional violation, so there's no need for the injunctive relief. Ex parte young is just inapplicable at that point, I believe. Okay. Thank you. Okay. We'll hear now from Mr. Smith. May it please the Court, I'm Vic Smith. I represent Dr. Woodall. Dr. Woodall is the doctor at the prison. He is not a state employee. It was attached to Dr. Woodall's affidavit, to Dr. Woodall's motion for summary judgment, his affidavit, as well as portions of the contract between MDOC and Wakesford Health Sources, his employer. Dr. Woodall treated Mr. DeLauder symptomatically. He is the one who made the initial referral, and I say he made the referral. According to the medical records, a different doctor, a Dr. McCleave, is the one who, and I believe it was March of that year, of 12, of 11, saw Mr. DeLauder. She made a recommendation that he be seen by an outside specialist. Dr. Woodall is the site medical director. He approved that. It basically goes up the line, and then it goes to MDOC. Dr. Woodall is not a surgeon. He is basically a family primary care doctor. So he's not in a position to do this surgery? He's not in a position to do this surgery. He has. What has he done for Mr. DeLauder to try to relieve the pain, et cetera? The records show that he's prescribed pain medication, anti-inflammatory, steroids. He or other medical providers there have given him Toradol injections. There's not much in the way of narcotic medication. Somewhere in there he was given some Toradol. I believe it was. But most of it is the anti-inflammatories. He's had solumedrol injections. He's ordered other diagnostic tests to try to see if there was something else that could be done. All he can do really at that point is refer him out, and he's made three different referrals or requests for outside specialty consultations. Once he makes that referral and he gets to MDOC, then someone at MDOC is the one. Is he still the doctor that treats prisoners in this? He is still, I believe, at SMCI. According to the last change of address Mr. DeLauder filed, he is no longer at SMCI. I believe he's at Parchment now. So now he's got different doctors. He's got a whole different set of. Does that include Hatton or is Hatton the top guy over the whole Mississippi? Hatton doesn't work for us, but I believe Hatton is only at SMCI. I guess Hatton is gone, but the Hatton position, is that over just this, the prison, the original prison? I believe he is just over SMCI. So we're dealing with a fairly, I say short, several-year time frame, but Mr. DeLauder was transferred to SMCI. So there's nothing for Woodall to do going forward in terms of injunction or anything like that. So the question is just whether there was any constitutional violation that he committed at the time. During that time. And his affidavit, Dr. Perry's affidavit and their motion all demonstrate that specialty care is not something that the local doctor. Somebody has a heart attack, yes, he's authorized to call the ambulance from the hospital. But for this type of thing. But he couldn't do the heart surgery. He couldn't do the heart surgery. He's not authorized. He's got no more authority than I do to load Mr. DeLauder up and drive him up to another doctor or anything. And we find all this in Dr. Woodall's affidavit? Yes, Your Honor. Attached to the summary judgment motion? Yes. Thank you.  Thank you. Let me ask you, Mr. York, on the question of the ex parte young. Did the Court apply ex parte young, or did the Court simply conclude that there was sovereign immunity from the injunctive relief? If my recollection is correct, ex parte young was not cited at any point in the Court's decision. And that was an issue that the parties agreed in the summary judgment briefing that ex parte young did not, under that, that Mr. Hatton in his official capacity did not have sovereign immunity from the injunctive relief. But the Court nevertheless applied it. They applied sovereign immunity. They said that he has sovereign immunity. So that would be sort of a facial reversible error, right? Yes. Not that the injunction may or may not help him if no doctor is going to perform the surgery. I get that. But as far as our position, we're still kind of frozen in time. We should send the injunctive relief question back. It would be your position. Yes, Your Honor. That's correct. Okay. So maybe that will help him going forward. I don't know. I'm troubled by the fact that this surgery is still lingering on all these years later. But that's a separate question. Getting back to the qualified immunity, what did Dr. What could Dr. Woodall have done differently? Put aside whatever constitutional violation there is. What could he just as a doctor have done differently than he did, given the circumstances? So Dr. Woodall was not entitled to qualified immunity. It's just that the deliberate indifference standard is the same standard, but he's not immune. Whether it's deliberate indifference or negligence or anything like that, what could he do? If you're a general practitioner and your patient needs intricate surgery that all across the country they're having trouble finding, what are you supposed to do? You can't do the surgery. It would be malpractice to do it, right? So what is Dr. Woodall supposed to do, period, regardless of what standard it meets or doesn't meet? Just as a doctor, what is he supposed to do differently than he did? Well, so in his affidavit he states that he had a position of authority to approve or disapprove. The record will show that he was the one who had to approve referrals out from the prison. Record 448 reflects that there was a consult put in that should have been put in in July of 2014 that never went through as of February 2015. Based on this record construed in Mr. DeLauter's favor, it certainly could support a conclusion that he had the ability to make sure that these consults took place. So there are big delays in the administration of care that could be attributed. And this is not part of the summary judgment record, but it is part of the record on appeal. Record 291 is an affidavit where Mr. DeLauter states that on January 2, 2015, the doctor told him he was withholding pain medication and would only give him Tylenol because of the lawsuit. That's in this record on appeal. So there's certainly at the summary judgment stage. And that sounds like a new lawsuit rather than reversing this one, because if that happened after the ruling. After the complaint was filed. After the complaint was filed. Was the complaint amended to incorporate that? Because that sounds like retaliation or something more than anything about medical care. Well, and this goes to the appointment of counsel and the complexity of this case in that he did attempt to amend his complaint, but it was obviously too late, at least obvious to an attorney. But, you know, as a prisoner, he sued the guy that he goes to see, the doctor, the people that he knows of. Mr. DeLauter doesn't receive information about the decisions covering his medical care. I told him on Friday that he was not going to be able to get the surgery. So there are obvious limitations to his ability to prove up this case. Mr. York, do you agree that if the State official puts qualified immunity at issue, does that adequately? It is now your client's burden to rebut that, to establish that qualified immunity does not apply? Yes, Your Honor. You agree with that? That's clearly clear in the law that that's the burden. Is there anything in the record that disputes the January 17 medical records? I don't believe so. That certainly did not occur until this appeal had already occurred, and by the time... You haven't filed another motion to supplement with something else? That's correct. When did you get in this case? I got in this case in, I believe, August of 2018. So it was expedited, submitted for expedited appeal at that point. You haven't had a lot of time to research medical records and whatever. You're running around trying to file a briefing. That's correct. Because August of 2018 is two months ago, right? Yes. That's correct. We had about a month to file the . . . Okay. So is it your position that if we sent any part of this back and counsel reported in the district court, we would get a more robust development of facts that might lean in favor of Mr. DeLauder? Yes, Your Honor. And to specifically this issue of who had what authority to do what, I think that if an attorney had been there to help develop that record, which is a complex issue, specifically in light of these immunity issues, we would have a much clearer picture. There may be other defendants who would be appropriate to add. And at the district court, we certainly would ask that this court remand and grant the relief requested. All right. Thank you, counsel. We appreciate your service pro bono, and we appreciate the arguments of the Mississippi attorney, Mississippi State attorneys as well.